[S.F. No. 23812. Mar. 30, 1979.]

MICHAEL ROBINS, a Minor, etc., et al., Plaintiffs and Appellants, v.
PRUNEYARD SHOPPING CENTER et al.,
Defendants and Respondents.

**COUNSEL**

Morgan, Beauzay, Hammer, Ezgar, Bledsoe & Rucka, Philip L. Hammer and Matthew J. McAlerney for Plaintiffs and Appellants.

Roger Jon Diamond, Hecht, Diamond & Greenfield, Susan L. Paulus, Susan M. Popik, Pettit & Martin, Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz, J. Albert Woll, Marsha S. Berzon, Laurence Gold, Jerry Williams, Fred H. Altshuler and Stephen P. Berzon as Amici Curiae on behalf of Plaintiffs and Appellants.

Ruffo, Ferrari & McNeil, Thomas P. O'Donnell and Bradford C. O'Brien for Defendants and Respondents.

Moless & Brinton, Joseph H. Moless, Jr., Adrian A. Kragen, Lawrence M. Cohen, Martin K. Denis and Fox & Grove as Amici Curiae on behalf of Defendants and Respondents.

Daniel H. Lowenstein, Robert M. Stern, Natalie E. West, Lee C. Rosenthal, Joseph Remcho and Rosen, Remcho & Henderson as Amici Curiae.

## OPINION

NEWMAN, J.— In this appeal from a judgment denying an injunction we hold that the soliciting at a shopping center of signatures for a petition to the government is an activity protected by the California Constitution.

Pruneyard Shopping Center is a privately owned center that consists of approximately 21 acres—5 devoted to parking and 16 occupied by walkways, plazas, and buildings that contain 65 shops, 10 restaurants, and a cinema. The public is invited to visit for the purpose of patronizing the many businesses. Pruneyard's policy is not to permit any tenant or visitor to engage in publicly expressive activity, including the circulating of petitions, that is not directly related to the commercial purposes. The policy seems to have been strictly and disinterestedly enforced.

Appellants are high school students who attempted one Saturday afternoon to solicit support for their opposition to a United Nations resolution against "Zionism." They set up a cardtable in a corner of Pruneyard's central courtyard and sought to discuss their concerns with shoppers and to solicit signatures for a petition to be sent to the White House in Washington. Their activity was peaceful and apparently well-received by Pruneyard patrons.

Soon after they had begun their soliciting they were approached by a security guard who informed them that their conduct violated Pruneyard regulations. They spoke to the guard's superior, who informed them they would have to leave because they did not have permission to solicit. The officers suggested that appellants continue their activities on the public sidewalk at the center's perimeter.[1]

---

[1]Pruneyard is bordered on two sides by private property, on its other sides by public sidewalks and streets.

Appellants immediately left the premises and later brought suit. The trial court rejected their request that Pruneyard be enjoined from denying them access.

Our main questions are: (1) Did *Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219] recognize federally protected property rights of such a nature that we now are barred from ruling that the California Constitution creates broader speech rights as to private property than does the federal Constitution. (2) If not, does the California Constitution protect speech and petitioning at shopping centers?

This court last faced those issues in *Diamond* v. *Bland* (1974) 11 Cal.3d 331 [113 Cal.Rptr. 468, 521 P.2d 460] (*Diamond II*), wherein *Diamond* v. *Bland* (1970) 3 Cal.3d 653 [91 Cal.Rptr. 501, 477 P.2d 733] (*Diamond I*) was reversed because of *Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551. The *Diamond* cases involved facts much like those of the instant case. *Diamond II* stated: "*Lloyd's* rationale is controlling here. In this case, as in *Lloyd,* plaintiffs have alternative, effective channels of communication, for the customers and employees of the center may be solicited on any public sidewalks, parks and streets adjacent to the Center and in the communities in which such persons reside." (11 Cal.3d at p. 335.)

The opinion articulating that conclusion did not examine the liberty of speech clauses of the California Constitution. A footnote suggested that such an inquiry was barred by federal and state supremacy clauses[2] because "[u]nder the holding of the *Lloyd* case, the due process clause of the United States Constitution protects the property interests of the shopping center owner from infringement (407 U.S. at pp. 552-553, 567, 570 [33 L.Ed.2d at pp. 133-134, 141, 143])." (11 Cal.3d at p. 335, fn. 4.)

Respondents contend that *Diamond II* was correctly decided and controls this case. They argue that *Lloyd* did more than define parameters of First Amendment free speech, that it recognized identifiable property rights under the Fifth and Fourteenth Amendments. They acknowledge that states are free to establish greater rights under their constitutions

---

[2]Article VI, clause 2 of the United States Constitution provides: "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the Judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."

Article III, section 1 of the California Constitution provides: "The State of California is an inseparable part of the United States of America, and the United States Constitution is the supreme law of the land."

than those guaranteed by the federal Constitution. They contend however that, since a ruling that petitioners' activity here was protected by the California Constitution would diminish respondents' property rights under *Lloyd,* we may not so rule.

Appellants argue that *Lloyd* merely defined federal speech rights and did not prescribe federal property rights. Even if it did prescribe such rights, appellants contend that, since states generally may regulate shopping centers for proper state purposes, California is free to impose public-interest restrictions on the centers in order to safeguard the right of petition. That right, they assert, surely reflects a public interest that equals in importance the interests that justify restrictions designed to ensure health and safety, a natural environment, aesthetics, property values, and other accepted goals. Such restrictions on property routinely are enacted or declared and enforced.

Appellants ask us to overrule *Diamond II* and to hold that the California Constitution does guarantee the right to seek signatures at shopping centers.

### Does *Lloyd* Identify Special Property Rights Protected by the Federal Constitution?

*Lloyd* held that a shopping center owner could prohibit distribution of leaflets when they communicated no information relating to the center's business and when there was an adequate, alternate means of communication. The court stated, "We hold that there has been no such dedication of Lloyd's privately owned and operated shopping center to public use as to entitle respondents to exercise therein the asserted First Amendment rights." (407 U.S. at p. 570 [33 L.Ed.2d at p. 143].)

Appellants correctly assert that *Lloyd* is primarily a First Amendment case. The references to Fifth and Fourteenth Amendment rights were made specifically in connection with the court's discussion of state action requirements. The court was focusing on *Marsh* v. *Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276], which held that a property owner's actions in some circumstances are equivalent to state action because of public functions performed by the property. The court in *Lloyd* examined the functions performed by Lloyd's center but did not purport to define the nature or scope of Fifth and Fourteenth Amendment rights of shopping center owners generally.

Subsequent decisions support that reading of *Lloyd.* In *Hudgens* v. *NLRB* (1976) 424 U.S. 507 [47 L.Ed.2d 196, 96 S.Ct. 1029] the court again considered First Amendment rights in relation to private property. Though it concluded that the First Amendment did not protect picketing in a shopping center, it acknowledged that "statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others . . . ." (*Id.,* p. 513 [47 L.Ed.2d p. 203].) The court's conclusion that the National Labor Relations Act controlled the issues there presented indicates that *Lloyd* by no means created any property right immune from regulation.

*Eastex, Inc.* v. *NLRB* (1978) 437 U.S. 556 [57 L.Ed.2d 428, 98 S.Ct. 2505] is comparable. The employees sought to distribute a four-part union newsletter. Two parts involved organizational requests; the other parts were irrelevant to the relations between employer and union.[3] A dissent by Justice Rehnquist, joined by Chief Justice Burger, states that property rights "explicitly protected from federal interference by the Fifth Amendment to the Constitution" were involved in the controversy. Rejecting that view, the majority had little difficulty recognizing that, as noted in *Hudgens, supra,* 424 U.S. at page 513 [47 L.Ed.2d at page 203], the National Labor Relations Act could provide statutory protection for the activity involved. The court observed that prior cases established that the act assures a right to distribute organizational literature on an employer's premises because employees already are rightfully there, to perform the duties of their employment. (See *Republic Aviations Corp.* v. *NLRB* (1945) 324 U.S. 793 [89 L.Ed. 1372, 65 S.Ct. 982, 157 A.L.R. 1081].) The court concluded, "Even if the mere distribution by employees of material . . . can be said to intrude on petitioner's property rights in any meaningful sense, the degree of intrusion does not vary with the content of the material." (*Eastex, supra,* 437 U.S. 556.)

The same may be said here. Members of the public are rightfully on Pruneyard's premises because the premises are open to the public during shopping hours. *Lloyd* when viewed in conjunction with *Hudgens* and *Eastex* does not preclude law-making in California which requires that shopping center owners permit expressive activity on their property. To hold otherwise would flout the whole development of law regarding

[3]It was clear prior to *Eastex* that employees' right of self-organization included the right to distribute organizational literature on the employer's property. (*Eastex, supra,* 437 U.S. 556.) The two parts of the newsletter at issue were a request to write the Legislature opposing a "right-to-work" measure and an expression of opposition to a presidential veto of a minimum wage increase.

states' power to regulate uses of property and would place a state's interest in strengthening First Amendment rights in an inferior rather than a preferred position. ■ "[A]ll private property is held subject to the power of the government to regulate its use for the public welfare." (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 403 [128 Cal.Rptr. 183, 546 P.2d 687]; app. dism. for want of substantial federal question, 429 U.S. 802 [50 L.Ed.2d 63, 97 S.Ct. 33].)

Property rights must yield to the public interest served by zoning laws (*Village of Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016]), to environmental needs (Pub. Resources Code, § 21000 et seq.), and to many other public concerns. (See, e.g., the California Coastal Act (*id.,* § 30000 et seq.), the California Water Quality Control Act (Wat. Code, § 13000 et seq.), the Subdivision Map Act (Gov. Code, § 66410 et seq.), and the Subdivision Lands Act (Bus. & Prof. Code, § 11000 et seq. See also Powell, *The Relationship Between Property Rights and Civil Rights* (1963) 15 Hastings L.J. 135, 148-149.)

"We do not minimize the importance of the constitutional guarantees attaching to private ownership of property; but as long as 50 years ago it was already ' "thoroughly established in this country that the rights preserved to the individual by these constitutional provisions are held in subordination to the rights of society. Although one owns property, he may not do with it as he pleases any more than he may act in accordance with his personal desires. As the interest of society justifies restraints upon individual conduct, so, also, does it justify restraints upon the use to which property may be devoted. It was not intended by these constitutional provisions to so far protect the individual in the use of his property as to enable him to use it to the detriment of society. By thus protecting individual rights, society did not part with the power to protect itself or to promote its general well-being. Where the interest of the individual conflicts with the interest of society, such individual interest is subordinated to the general welfare." ' " (*Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d at p. 403, holding that use of private property may be restricted because of the public interest in collective bargaining, and quoting *Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 488 [234 P. 381, 38 A.L.R. 1479].)

■ The *Agricultural Labor Relations Board* opinion further observes that the power to regulate property is not static; rather it is capable of expansion to meet new conditions of modern life. Property rights must be " 'redefined in response to a swelling demand that ownership be

responsible and responsive to the needs of the social whole. Property rights cannot be used as a shibboleth to cloak conduct which adversely affects the health, the safety, the morals, or the welfare of others.' " (16 Cal.3d at p. 404, quoting Powell, *The Relationship Between Property Rights and Civil Rights, supra,* 15 Hastings L.J. at pp. 149-150.)

■ Several years have passed since this court decided *Diamond II.* Since that time central business districts apparently have continued to yield their functions more and more to suburban centers. Evidence submitted by appellants in this case helps dramatize the potential impact of the public forums sought here:

(1) As of 1970, 92.2 percent of the county's population lived outside the central San Jose planning area in suburban or rural communities.

(2) From 1960 to 1970 central San Jose experienced a 4.7 percent decrease in population as compared with an overall 67 percent increase for the 19 north county planning areas.

(3) Retail sales in the central business district declined to such an extent that statistics have not been kept since 1973. In 1972 that district accounted for only 4.67 percent of the county's total retail sales.

(4) In a given 30-day period between October 1974 and July 1975 adults making one or more shopping trips to the 15 largest shopping centers in the metropolitan San Jose statistical area totaled 685,000 out of 788,000 adults living within that area.

(5) The largest segment of the county's population is likely to spend the most significant amount of its time in suburban areas where its needs and wants are satisfied; and shopping centers provide the location, goods, and services to satisfy those needs and wants.

In assessing the significance of the growing importance of the shopping center we stress also that to prohibit expressive activity in the centers would impinge on constitutional rights beyond speech rights. Courts have long protected the right to petition as an essential attribute of governing. (*United States* v. *Cruikshank* (1876) 92 U.S. 542, 552 [23 L.Ed. 588, 591].) The California Constitution declares that "people have the right to . . . petition government for redress of grievances . . . ." (Art. I, § 3.) ■ That right in California is, moreover, vital to a basic process in the state's constitutional scheme—direct initiation of change by the

citizenry through initiative, referendum, and recall. (Cal. Const., art. II, §§ 8, 9, and 13.)[4]

■ To protect free speech and petitioning is a goal that surely matches the protecting of health and safety, the environment, aesthetics, property values and other societal goals that have been held to justify reasonable restrictions on private property rights.

### DOES THE CALIFORNIA CONSTITUTION GUARANTEE THE RIGHT TO GATHER SIGNATURES AT SHOPPING CENTERS?

No California statute prescribes that shopping center owners provide public forums. But article I, section 2 of the state Constitution reads: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Though the framers could have adopted the words of the federal Bill of Rights they chose not to do so. (See Note, *Rediscovering the California Declaration of Rights* (1974) 26 Hastings L.J. 481.) Special protections thus accorded speech are marked in this court's opinions. *Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116], for instance, noted that "[a] protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press."

Past decisions on speech and private property testify to the strength of "liberty of speech" in this state. *Diamond I* held that distributing leaflets and soliciting initiative signatures at a shopping center are constitutionally protected. Though the court relied partly on federal law, California precedents also were cited. (E.g., *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921]; *In re Lane* (1969) 71 Cal.2d 872 [79 Cal.Rptr. 729, 457 P.2d 561]; *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353].) The fact that those opinions cited federal law that subsequently took a divergent course does not diminish their usefulness as precedent. (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 247

---

[4]The Fair Political Practices Commission filed an amicus brief supporting appellants here. The commission urges that we consider the impact of our decision on exercise of the right to initiate change through the initiative, referendum, and recall processes. The brief points out that, because of the large number of signatures required to succeed in an initiative, referendum, or recall drive, guaranteeing access to voters is essential to make meaningful the right to mount such a drive.

[145 Cal.Rptr. 861, 578 P.2d 108]; and see Cal. Const. Revision Com., Recommendations (1971) art. I, § 3, com., p. 17 ["Federal . . . legal precedents are subject to change and uncertain in scope"].) The duty of this court is to help determine what "liberty of speech" means in California. Federal principles are relevant but not conclusive so long as federal rights are protected.

*Schwartz-Torrance, supra,* 61 Cal.2d 766, held that a labor union has the right to picket a bakery located in a shopping center. The opinion noted that the basic problem is one of "accommodating conflicting interests: plaintiff's assertion of its right to the exclusive use of the shopping center premises to which the public in general has been invited as against the union's right of communication of its position which, it asserts, rests upon public policy and constitutional protection." (61 Cal.2d at p. 768.)

*In re Lane, supra,* extended the assurance of protected speech to the privately owned sidewalk of a grocery store. "Certainly, this sidewalk is not private in the sense of not being open to the public. The public is openly invited to use it in gaining access to the store and in leaving the premises. Thus, in our view it is a public area in which members of the public may exercise First Amendment rights." (71 Cal.2d at p. 878.)

The issue arose too in *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353], where Vietnam War protesters had attempted to distribute leaflets in the Los Angeles Union Station, owned by three private companies. It housed a restaurant, snack bar, cocktail lounge, and magazine stand in addition to facilities directly related to transporting passengers. The public was free to use the whole station. Chief Justice Traynor's opinion made it clear that property owners as well as government may regulate speech as to time, place, and manner. (*Id.,* at pp. 852-853.) Nonetheless, "a railway station is like a public street or park." (*Id.,* at p. 851.) Further, "the test is not whether petitioners' use of the station was a railway use but whether it interfered with that use." (*Id.*) The opinion thus affirms that the public interest in peaceful speech outweighs the desire of property owners for control over their property. (See too *In re Cox* (1970) 3 Cal.3d 205, 217-218 [90 Cal.Rptr. 24, 474 P.2d 992]: "The shopping center may no more exclude individuals who wear long hair . . . who are black, who are members of the John Birch Society, or who belong to the American Civil Liberties Union, merely because of these characteristics or associations, than may the City of San Rafael.")

*Diamond I,* quoting *Schwartz-Torrance, supra,* stated: " '[T]he countervailing interest which [the owner] endeavors to vindicate emanates from the exclusive possession and enjoyment of private property. Because of the public character of the shopping center, however, the impairment of [the owner's] interest must be largely theoretical. [The owner] has fully opened his property to the public. . . .' " (*Diamond I, supra,* 3 Cal.3d at p. 662, bracketed material in original.)

In his *Diamond II* dissent Justice Mosk described the extensive use of private shopping centers.[5] His observations on the role of the centers in our society are even more forceful now than when he wrote. The California Constitution broadly proclaims speech and petition rights. Shopping centers to which the public is invited can provide an essential and invaluable forum for exercising those rights.

■ We therefore hold that *Diamond II* must be overruled. (See particularly 11 Cal.3d at p. 335, fn. 4.) A closer look at *Lloyd Corp., supra,* 407 U.S. 551, has revealed that it does not prevent California's providing greater protection than the First Amendment now seems to provide. We conclude that sections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned.

By no means do we imply that those who wish to disseminate ideas have free rein. We noted above Chief Justice Traynor's endorsement of time, place, and manner rules. (*In re Hoffman, supra,* 67 Cal.2d at pp. 852-853.) Further, as Justice Mosk stated in *Diamond II,* "It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping

---

[5]"The importance assumed by the shopping center as a place for large groups of citizens to congregate is revealed by statistics: in 21 of the largest metropolitan areas of the country shopping centers account for 50 percent of the retail trade; in some communities the figure is even higher, such as St. Louis (67 percent) and Boston (70 percent). (Note (1973) Wis.L.Rev. 612, 618 and fn. 51.) Increasingly, such centers are becoming 'miniature downtowns'; some contain major department stores, hotels, apartment houses, office buildings, theatres and churches. (Business Week, Sept. 4, 1971, pp. 34-38; Chain Store Age, Sept. 1971, p. 4.) It has been predicted that there will be 25,000 shopping centers in the United States by 1985. (Publishers Weekly, Feb. 1, 1971, pp. 54-55.) Their significance to shoppers who by choice or necessity avoid travel to the central city is certain to become accentuated in this period of gasoline and energy shortage." (11 Cal.3d at p. 342 (dis. opn. of Mosk, J.).)

center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations (see *Diamond* [*I*] at p. 665) would not markedly dilute defendant's property rights." (11 Cal.3d at p. 345 (dis. opn. of Mosk, J.).)

The judgment rejecting appellants' request that Pruneyard be enjoined from denying access to circulate the petition is reversed.

Bird, C. J., Tobriner, J., and Mosk, J., concurred.

**RICHARDSON, J.**—I respectfully dissent. The majority relegates the private property rights of the shopping center owner to a secondary, disfavored, and subservient position vis-à-vis the "free speech" claims of the plaintiffs. Such a holding clearly violates *federal* constitutional guarantees announced in *Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219].

The majority recites, in cursory fashion, that the trial court herein "rejected [plaintiffs'] request that Pruneyard be enjoined from denying them access." (*Ante,* p. 903.) Conspicuously absent from the opinion, however, is any reference to the trial court's careful findings of fact and conclusions of law, which are essential to a proper understanding and disposition of this case.

In brief, following a full evidentiary hearing, the trial court specifically found as follows: The Pruneyard Shopping Center is located entirely on private property, and its owner had adopted a nondiscriminatory policy of prohibiting all handbilling and circulation of petitions by anyone and regardless of content. Plaintiffs entered on Pruneyard property and sought to obtain signatures to petitions entirely unrelated to any activities occurring at the center. (The petitions were to the President of the United States and the Congress opposing a United Nations resolution which condemned Zionism and attacking Syria's emigration policy.) Pruneyard is located in Santa Clara County which contains numerous forums for distributing handbills or gathering signatures, including "many shopping centers, public shopping and business areas, public buildings, parks, stadia, universities, colleges, schools, post offices and similar public areas where large numbers of people congregate." The court further found that numerous alternative public sites were available to plaintiffs for their

purposes. Nonetheless, plaintiffs made no attempt whatever to obtain signatures on their petition in these alternative public areas, whether situated nearby or otherwise.

From the foregoing findings of fact the trial court expressly concluded as matters of law that there had been no dedication of the center's property to public use, that the center is not the "functional equivalent" of a municipality, and that "There are adequate, effective channels of communication for plaintiffs other than soliciting on the private property of the Center." On the basis of these findings of fact and conclusions of law, the trial court denied plaintiffs the injunctive relief which they sought.

With due deference, I suggest that the able trial court's judgment was not only entirely proper, but was compelled by the holdings in *Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551, and *Diamond* v. *Bland* (1974) 11 Cal.3d 331 [113 Cal.Rptr. 468, 521 P.2d 460] (cert. den. 419 U.S. 885 [42 L.Ed.2d 125, 95 S.Ct. 152]). The present majority, unable to escape the controlling force of *Lloyd,* acknowledges that "*Lloyd* held that a shopping center owner could prohibit distribution of leaflets when they communicated no information relating to the center's business and when there was an adequate, alternate means of communication." (*Ante,* p. 904.) However, the majority attempts to circumvent *Lloyd* by relying upon the "liberty of speech clauses" of the California Constitution. I believe that such an analysis is clearly incorrect, because the owners of defendant Pruneyard Shopping Center possess *federally* protected property rights which do not depend upon the varying and shifting interpretations of state constitutional law for their safeguard and survival. Indeed, this was the precise effect of our own express holding in *Diamond* v. *Bland, supra,* wherein we stated with great clarity that ". . . we must reject plaintiff's proposal . . . that we consider using the 'free speech' provisions of our state Constitution to reach a contrary result in this case. Even were we to hold that the state Constitution in some manner affords broader protection than the First Amendment to the United States Constitution . . . , *nevertheless supremacy principles would prevent us from employing state constitutional provisions to defeat defendant's federal constitutional rights.*" (11 Cal.3d at p. 335, fn. 4, italics added.) This constitutional principle is as sound today as it was less than five years ago when we last expressed it.

The application of our *Diamond* holding to the case before us is clear and inescapable. Nonetheless, the present majority now disavows *Dia-*

*mond* and attempts to distinguish *Lloyd* as "primarily a First Amendment case" rather than a private property case. (*Ante,* p. 904.) Apparently, the majority now believes that *Lloyd* merely held that the leaflet distributors in that case lacked any *First Amendment* rights to assert against the shopping center owners, a deficiency the majority would now cure by creating more substantial "free speech" rights under the California Constitution than are recognized under the First Amendment.

The majority seriously errs in its excessively narrow reading of *Lloyd,* which expressed its fundamental reliance upon the *constitutional private property rights of the owner* throughout the entire opinion. This becomes apparent in the opening paragraph of *Lloyd,* wherein the high court, speaking through Justice Powell, explained that "We granted certiorari to consider petitioner's contention that the decision below *violates rights of private property protected by the Fifth and Fourteenth Amendments.*" (407 U.S. at pp. 552-553 [33 L.Ed.2d at p. 133], italics added.) The court further observed that "The basic issue in this case is whether respondents, in the exercise of asserted First Amendment rights, may distribute handbills on Lloyd's private property contrary to its wishes and contrary to a policy enforced against *all* handbilling." (P. 567 [33 L.Ed.2d at p. 142], italics in original.) The *Lloyd* court carefully admonished that "It would be *an unwarranted infringement of property rights* to require them to yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist. Such an accommodation would diminish property rights without significantly enhancing the asserted right of free speech." (*Ibid.* [33 L.Ed.2d, pp. 141-142], italics added.) This has precise application to the case before us for, as noted above, the trial court in the present case expressly found that plaintiffs had adequate alternative forums in which to conduct their activities. Contrary to the majority's thesis, *Lloyd* cannot be distinguished. It was, and is, a *property rights case of controlling force* in the litigation before us.

Recognizing the "special solicitude" owed to the First Amendment guarantees, the high court in *Lloyd* nonetheless noted that "this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." (P. 568 [33 L.Ed.2d p. 142].) Moreover, the court determined that although a *shopping center* is open to the public, "property [does not] lose its private character merely because the public is generally invited to use it for designated purposes." (P. 569 [33 L.Ed.2d, p. 143].) It is self-evident that the *federally* protected property

rights are the same whether the shopping center is in *Oregon,* as in *Lloyd,* or in *California,* as in the present case.

The *Lloyd* court acknowledged that considerations of public health and safety may justify an "appropriate government response" through police power regulations. (P. 570 [33 L.Ed.2d, p. 143].) However, "the Fifth and Fourteenth Amendment rights of private property owners, as well as the First Amendment rights of all citizens, must be respected and protected. The Framers of the Constitution certainly did not think these fundamental rights of a free society are incompatible with each other. There may be situations where accommodations between them, and the drawing of lines to assure due protection of both, are not easy. *But on the facts presented in this case, the answer is clear.* [¶] We hold that there has been no such dedication of Lloyd's privately owned and operated shopping center to public use as to entitle respondents to exercise therein the asserted First Amendment rights." (*Ibid.* [33 L.Ed.2d p. 143], italics added.)

The lesson to be learned from *Lloyd* is unmistakable and irrefutable: A private shopping center owner is protected by the *federal* Constitution from unauthorized invasions by persons who enter the premises to conduct general "free speech" activities unrelated to the shopping center's purposes and functions. Nor is the foregoing principle in any way diminished or affected by the fact that the claimed free speech rights are purportedly sanctioned by the California Constitution, given the overriding supremacy of the federal Constitution.

The familiar words of article VI, clause 2, of the United States Constitution read as follows: "*This Constitution,* and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, *shall be the supreme law of the land;* and the *Judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.*" (Italics added.) The controlling import of the supremacy clause on the issue before us is readily apparent. The United States Supreme Court, interpreting the United States Constitution, has declared that an owner of a private shopping center "when adequate, alternative avenues of communication exist," has a property right protected by the Fifth and Fourteenth Amendments which is superior to the First Amendment right of those who come upon the shopping center premises for purposes unrelated to the center. In such cases, no state court, interpreting a state Constitution, including this court interpreting the California Constitution, can contravene such a federal constitutional-

ly protected right. Thus, in this case, the majority is prevented from relying on the California Constitution to impair or interfere with those property rights. We are bound by the United States Supreme Court interpretations of the United States Constitution. More specifically, in a confrontation between federal and state constitutional interests, federally protected property rights recognized by the United States Supreme Court will prevail against state protected free speech interests where alternative means of free expression are available.

The federal cases decided in this area subsequent to *Lloyd* do not support the majority's holding. In *Hudgens* v. *NLRB* (1976) 424 U.S. 507 [47 L.Ed.2d 196, 96 S.Ct. 1029], the high court cited and quoted from *Lloyd* with obvious approval, and extended *Lloyd*'s holding to encompass labor dispute picketing within a private shopping center. The picketers in *Hudgens* had argued that their free speech interests were paramount to the private property rights of the center owner, given the existence of a labor dispute with one of the center's lessees. The high court rejected the argument, relying upon *Lloyd,* and remanded the case to the National Labor Relations Board for disposition. Contrary to the suggestion of the majority herein, the remand to the NLRB was not an implied rejection of the property interests of the center owner, for it is well established (by a companion case to *Lloyd*) that the NLRB *must* uphold the owner's private property rights in such cases unless there has been an outright dedication of the center property to public use. (*Central Hardware Co.* v. *NLRB* (1972) 407 U.S. 539, 547 [33 L.Ed.2d 122, 128-129, 92 S.Ct. 2238].) As *Central Hardware* explains, and echoing *Lloyd,* to accept the premise that such a dedication occurs merely because private property is "open to the public" for commercial purposes would constitute "an unwarranted infringement of long-settled *rights of private property* protected by the Fifth and Fourteenth Amendments." (*Ibid.* [33 L.Ed.2d 122, 129], italics added.)

Nor does the recent case of *Eastex, Inc.* v. *NLRB* (1978) 437 U.S. 556 [57 L.Ed.2d 428, 98 S.Ct. 2505], assist the majority. There, the Supreme Court upheld the rights of *employees* to distribute certain organizational material at their work site. The distinction between the rights of employees and nonemployees in this situation is well recognized, as was expressly noted by the *Eastex* court itself: "The Court recently has emphasized the distinction between the two cases: 'A wholly different balance was struck when the organizational activity was carried on by employees already rightfully on the employer's property, since the employer's management interests *rather than his property interests* were

there involved.' [Citing *Hudgens,* 424 U.S. 507, and *Central Hardware,* 407 U.S. 539, both *supra.*]." (Pp. 571-572 [57 L.Ed.2d p. 442], italics added.)

The majority correctly observes that "property rights must yield to the public interest served by zoning laws . . . , to environmental needs . . . , and to many other public concerns." (*Ante,* p. 906.) Yet the "zoning for free speech uses" which the majority attempts to accomplish today goes far beyond any traditional police power regulation. Such unprecedented fiat has no support in constitutional, statutory or decisional law. The character of a free speech claim cannot be transmuted into something else by changing the label and invoking the police power. As noted above, the *Lloyd* case acknowledged that considerations of public health and safety may justify an "appropriate government response," but that "on the facts presented in this case, *the answer is clear.*" (407 U.S. at p. 570 [33 L.Ed.2d at p. 143], italics added; see also, *Euclid* v. *Ambler Co.* (1926) 272 U.S. 365, 395 [71 L.Ed. 303, 314, 47 S.Ct. 114, 54 A.L.R. 1016] [zoning laws, and other police power regulations, must have a substantial relation to the public health, safety, morals or general welfare].)

Because, as the trial court expressly found, plaintiffs had adequate public forums in which to conduct their activities, their unauthorized entries on Pruneyard property manifestly cannot be excused on the basis of any state policy or goal "to protect free speech and petitioning." (*Ante,* p. 908.) The *Lloyd* rationale is applicable and unanswerable. The majority may not evade it by resort, in this instance, to the California Constitution, which must yield to a paramount federal constitutional imperative.

The judgment should be affirmed.

Clark, J., and Manuel, J., concurred.

Respondents' petition for a rehearing was denied May 23, 1979. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.