Cordy, J.
(dissenting). The court in this case significantly
expands the scope of the right afforded by art. 9 of the Massachusetts Declaration of Rights at the expense of the rights of countless commercial property owners across the Commonwealth. In so doing, its reasoning departs not only from the cautious analysis employed in Batchelder v. Allied Stores Int'l, Inc., 388 Mass. 83 (1983) (Batchelder I), but also from the overwhelming national consensus on the proper balancing of rights where a limited right to solicit signatures on private property is recognized. By failing to recognize the enormous differences between large shopping complexes that duplicate traditional downtown functions and freestanding stores selling multiple products, the court completely undoes the intended balance between the rights of property owners and the rights of those whom they invite to use their property, and creates serious consequences for property owners who miscalculate their obligations despite their best intentions. For these reasons, I respectfully dissent.
Roche Bros. Supermarkets, Inc. (Roche Bros.), advocates for a functional equivalence test that is supported by Batchelder I and by the decisional law of other jurisdictions that have grappled with this issue. This test would provide clearer guidance to property owners and individuals and would achieve an appropri *766 ate balancing of interests.[1] Under the functional equivalence test, where private property intentionally fills “the societal role of a town center” such that it is the functional equivalent of a traditional downtown district, private property rights must yield to an individual’s exercise of his or her art. 9 right, subject to reasonable time, place, and manner restrictions. See Albertson’s, Inc. v. Young, 107 Cal. App. 4th 106, 115 (2003), citing Robins v. Pruneyard Shopping Ctr., 23 Cal. 3d 899 (1979), aff’d, PruneYard Shopping Ctr. v. Robins, 447 U.S. 74 (1980). The primary consideration in this test is the intended use, design, and character of the property and its common areas in relation to the life of the community, reflected largely in the nature of the invitation extended to the public. Where a property owner invites the public for nearly limitless use, and thereby replicates the environment and function of a downtown district in facilitating mixed commercial and social endeavors, the balance of rights tips in favor of the individual seeking to exercise rights guaranteed in such public forums. See Marsh v. Alabama, 326 U.S. 501, 506 (1946) (“The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it”). The inverse is that where a property owner invites the public for a more limited use, reflected in a utilitarian design facilitating only the specific commercial purpose of the invitation, the balance tips in favor of the owner, as the limited invitation results in the retention of some of the property’s private nature. See Lloyd Corp. v. Tanner, 407 U.S. 551, 569 (1972) (“property [does not] lose its private character merely because the public is generally invited to use it for designated purposes”).
The functional equivalence test finds support in Batchelder I and in the analyses employed by other courts on this issue. Batchelder I involved the then largest shopping mall in Massachusetts, which included ninety-five separate retail stores, a movie theater, a bowling alley, an exercise facility, a beauty *767 salon, a religious facility, and common areas that, as a practical matter, were dedicated to the public. See Batchelder I, 388 Mass. at 85, 86 & n.4, 92-93 & n.12. The court concluded that where the mall offered such a breadth of potential uses of the property to the public, it functioned as the equivalent of a downtown area, intentionally recreating the traditional downtown district. Consequently, the mall owners could not deny visitors the right to solicit signatures that they would otherwise enjoy in equivalent public spaces. See id. at 92-93.
The United States Supreme Court and the California appellate courts, on whose decisions this court relied in Batchelder I, 388 Mass. at 87-88, 90-91, have similarly affirmed a limited right to engage in signature solicitation or speech-related rights on private property that holds itself out to the public for nearly unlimited use consistent with the function of a downtown district.[2] See PruneYard, 447 U.S. at 78-79, aff’g Robins, 23 Cal. 3d at 910-911 (State constitutional free speech right can be extended to large shopping center); Marsh, 326 U.S. at 502-503, 509 (business district of town wholly owned by private corporation, which contained residences, streets, sewers, and business block with shopping center, was so broadly open for public use that private property owners’ right to limit use must yield to right to distribute religious literature that would be otherwise available on public property); Ralphs Grocery Co. v. United Food & Commercial *768 Workers Union Local 8, 55 Cal. 4th 1083, 1104 (2012), cert. denied, 133 S. Ct. 2799 (2013); Albertson’s, Inc., 107 Cal. App. 4th at 110, 118-119, and cases cited. See also Hudgens v. National Labor Relations Bd., 424 U.S. 507, 518 (1976) (free speech right under First Amendment to United States Constitution does not extend to private property), overruling Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 318 (1968) (large shopping center containing roads and sidewalks was functional equivalent of downtown business district and therefore certain First Amendment rights could not be infringed there).
Other States that use a multifactor balancing test akin to the court’s interpretation of Batchelder I also place significant emphasis on the nature of the invitation extended to the public. See, e.g., Bock v. Westminster Mall Co., 819 P.2d 55, 61, 62 (Colo. 1991) (assessing whether common areas of mall “effectively function as a public place” or “equivalent of a downtown business district”); New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp., 138 N.J. 326, 333, 362 (1994), cert. denied sub nom. Short Hills Assocs. v. New Jersey Coalition Against War in the Middle East, 516 U.S. 812 (1995), citing State v. Schmid, 84 N.J. 535, 563 (1980) (assessing “normal use of the property, the extent and nature of the public’s invitation to use it, and the purpose of the expressional activity in relation to both its private and public use”); Waremart, Inc. v. Progressive Campaigns, Inc., 139 Wash. 2d 623, 629, 631, 636 (1999) (assessing whether store is functional equivalent of downtown area and considering, among several factors, scope of invitation to public and intent of property owner, as well as nature and use of property and of right sought to be exercised). The functional equivalence test therefore has support both in our own precedent and that of other jurisdictions.
Applying this test, it is clear that there is a meaningful difference between large shopping malls, which consistently have been deemed places where a solicitation right may not be infringed, and freestanding supermarkets, which consistently have been deemed places where such rights are not protected.
A large shopping mall like the one at issue in Batchelder I can span over eighty acres, typically serving hundreds of thousands of visitors per week, and containing a wide variety of retail and department stores, commercial establishments, and many other services and amenities. See Batchelder I, 388 Mass. at 85. See *769 also Bock, 819 P.2d at 62; J.M.B. Realty Corp., 138 N.J. at 338, 339. Connecting these establishments within the mall are common areas that contain seating, plazas, amenities, and spaces where visitors can gather. See Van v. Target Corp., 155 Cal. App. 4th 1375, 1388-1389 (2007); J.M.B. Realty Corp., supra at 339. The common areas “produc[e] a congenial environment that encourages passing shoppers to stop and linger, [and] to leisurely congregate for purposes of relaxation and conversation.” Ralphs Grocery Co., 55 Cal. 4th at 1092; Bock, supra (visitors “engage, no doubt, in conversations on all subjects” in common areas of mall). In these common areas, the mall provides regular programming and events, some “charitable and civic” and meant to connect the community, others “simply entertainment,” Batchelder I, supra at 86 & n.4, that draw visitors who may or may not plan to shop. See J.M.B. Realty Corp., supra at 334, 358. See also Waremart, 139 Wash. 2d at 636-637 (malls often have walking groups, choir meetings, and other activities).
Although its primary purpose, as with any commercial endeavor, is to make a profit, the mall promotes itself as a place where all members of the community can engage in any number of activities, thereby blurring the line between commercial, civic, and expressive endeavors.[3] The resulting invitation to the public to use the mall is all-inclusive: to shop, to be entertained, to attend to personal or health needs, to congregate, to learn, to connect with others, and to do all the activities one could do in a downtown area. See Robins, 23 Cal. 3d at 910-911; J.M.B. Realty Corp., supra at 333-334, 359.
In so opening the property to a nearly limitless range of uses, the mall situates itself as the functional equivalent of and substitute for the downtown district, where historically communities have gathered for such mixed purposes.[4] See Ralphs Grocery Co., *770 55 Cal. 4th at 1091, quoting Robins, 23 Cal. 3d at 907, 910; J.M.B. Realty Corp., 138 N.J. at 333-334, 357, 359. As a result, because the mall intentionally replaces Main Street, it is appropriate for community members to enjoy at least some of the expressive rights that they otherwise would be able to exercise on the traditional Main Street.
Indeed, “every state that has found certain of its constitutional free-speech-related provisions effective regardless of ‘state action’ has ruled that shopping center owners cannot prohibit that free speech” (emphasis in original). J.M.B. Realty Corp., 138 N.J. at 352, 360. See, e.g., Batchelder I, 388 Mass. at 92-93; Robins, 23 Cal. 3d at 905-906; Bock, 819 P.2d at 62 (“[mjall functions as the equivalent of a downtown business district” because it contains wide variety of commercial and retail establishments, permits range of activities in common areas, and facilitates public gathering and discussion by opening common areas for varied use); Alderwood Assocs. v. Washington Envtl. Council, 96 Wash. 2d 230, 246 (1981) (large regional shopping center “performs a traditional public function by providing the functional equivalent of a town center or community business block”).
In stark contrast, a freestanding supermarket like Roche Bros., no matter how large, does not replicate a downtown area on these measures. A supermarket occupies significantly less acreage, here just under five acres, and may contain a handful of ancillary businesses, such as the full-service bank that leases a small portion of the space inside the Roche Bros, store here. Although the complaint does not allege additional facts,[5] the store may have a few chairs inside and a few benches along the sidewalk near a single entrance and exit. But there is no allegation that the entryway where the plaintiff sought to solicit signatures serves any more than the limited purpose of facilitating the entrance and exit of shoppers. Cf. Ralphs Grocery Co., 55 Cal. 4th at 1092 (“areas immediately adjacent to the entrances of individual stores *771 typically lack seating and are not designed to promote relaxation and socializing,” but rather “serve utilitarian purposes of facilitating customers’ entrance to and exit from the stores and also, from the store’s perspective, advertising the goods and services available within”). This limited purpose is meaningfully different from the vast invitation of the open spaces intentionally provided in large shopping malls. Absent common areas, advertised programming, or a host of unrelated amenities designed to encourage visitors to pursue varied needs, the invitation Roche Bros, extends to the public for use of its property is a far more limited one than that of a large mall: to purchase the goods and services Roche Bros, offers.[6] See Costco Cos. v. Gallant, 96 Cal. App. 4th 740, 755 (2002). All of the areas and features of the store are designed toward this purpose. There is no general invitation to gather or to come to the store for some other purpose; there is only the invitation to shop and to utilize the ancillary services provided in furtherance of this invitation. See Albertson’s, Inc., 107 Cal. App. 4th at 120-121. See also Lloyd Corp., 407 U.S. at 569.
I am very troubled by the court’s suggestion that the variety of the items sold by Roche Bros, is particularly relevant to the analysis. See ante at 758-759. This is a matter of convenience and not of constitutional importance. The court allows itself to be distracted by the plaintiff’s argument that because the supermarket offers products that in a bygone era would require visits to numerous stores, the supermarket must be considered a wholesale replica of a downtown shopping district. This argument shifts the inquiry from the design and purposeful use of the property to the inventory of the particular store, which may change with the seasons, global product availability, business priorities, consumer demand, or any number of variables irrelevant to the constitutional analysis we are conducting here. It diminishes the weight *772 of other more important considerations by focusing on an individual store owner’s business acumen in determining that a customer might like to buy aspirin and tissues along with orange juice. Were inventory determinative, every general store in the Commonwealth that is not accessible by a public walkway, from the shoeshine-cum-sundries shops nestled within the corporate towers of downtown Boston to the pharmacies and big-box stores which now dot our urban and suburban environment, might be found to have surrendered their property rights to those of individual citizens, with no further inquiry into whether these stores truly function as the equivalent to downtown districts.[7]
It cannot be that a single store, designed to invite customers for a limited commercial purpose, falls into the same class as a large shopping mall simply because it carries a varied inventory.[8] This convenience factor does not import the social and gathering functions that result from the intentional design and use of a property’s common areas to facilitate community congregation, nor does it transform the invitation from a specific commercial one (fulfil all of your daily shopping needs here) to an all-inclusive one (do whatever you would like here). See Trader Joe’s Co. v. Progressive Campaigns, Inc., 73 Cal. App. 4th 425, 433 (1999).
Rather, supermarkets that lack common spaces designed to facilitate congregation and encourage visitors with varied agendas fail to replicate the historic downtown district. For this reason, other States have explicitly rejected the analogy of a single store or supermarket, even where situated among a few other stores, to a downtown district or to a large shopping mall, and accordingly they have declined to extend certain individual liberties to such private property. See Ralphs Grocery Co., 55 Cal. 4th at 1093, 1104 (entryway to supermarket not public forum because not “designed and furnished in a way that induces shoppers to congregate,” but rather “to walk to or from a parking area”); Van, 155 Cal. App. 4th at 1388-1389 (entrances to Target, *773 Wal-Mart, and Home Depot stores not “functional equivalent of a traditional public forum” because “designed to encourage shopping as opposed to meeting friends, congregating or lingering,” and did not contain “courtyards, plazas or other places designated to encourage patrons to spend time together or be entertained”); Albertson’s, Inc., 107 Cal. App. 4th at 120-121 (supermarket not “functional equivalent of traditional public forum” because it “does not invite the public to meet friends, to eat, to rest, to congregate, or to be entertained at its premises,” and its entrance is not “place where people choose to come and meet and talk”); Costco Cos., 96 Cal. App. 4th at 755 (Costco stores not “miniature downtowns” because customers go to stores “to purchase ... goods and services offered by Costco,” not “with the expectation they will meet friends, be entertained, dine or congregate”); People v. DiGuida, 152 III. 2d 104, 126-127 (1992) (freestanding grocery store does not “presentí ] itself as a forum for free expression” because does not give “impression that its property was public in nature and open to expressive activities”); J.M.B. Realty Corp., 138 N.J. at 373 (“No highway strip mall, ... no single huge suburban store, no stand-alone use, and no small to medium shopping center sufficiently satisfies the standard ... to warrant the constitutional extension of free speech to those premises”); Fred Meyer Stores, Inc. v. Garrett, 191 Or. App. 582, 585-586 (2004) (no right to solicit petition signatures at supermarket marketing itself as one-stop shop and offering mailboxes, automated teller machines, public telephones, and seating areas because invitation to public not sufficiently broad); Waremart, 139 Wash. 2d at 636-637 (no right to petition or solicit signatures at retail grocery store that invites public for limited commercial purposes and not “for any noncommercial purpose,” because store does not “promote any public services on their locations,” does not have “areas for citizens to congregate^] . . . wait or converse,” and “bear[s] none of the characteristics of a town center” [citations omitted]). See also Lloyd Corp., 407 U.S. at 569 (“Few would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there”). This court, however, has chosen to ignore this consensus and the predictable reasoning underlying it.
Even under the Batchelder I balancing test as the court interprets it, which entails more interest-based rather than size, scope, and functional considerations, the balance to be struck for a *774 supermarket like Roche Bros, should not lean in favor of art. 9 rights. I need not discuss the individual interests of using a local grocery store as a place for the solicitation of signatures — that much is clear from the court’s opinion, and I do not dispute the importance of this interest. But the court undervalues Roche Bros.’ claims of perceived indorsement and interference with its commercial enterprise and its own constitutional property and speech rights, such that the court miscalculates the interests at stake.
Where a retail business stands alone in its physical space, unaccompanied by other stores, there is a real risk that it will be seen as indorsing a candidate for whom signatures are being solicited outside its entrance. In addition, where there is only one entrance, and the supposed “common area” of the property consists of the walkway to that entrance, other customers will be unable to avoid the solicitations as they enter and leave the store.[9] As the California Supreme Court has observed, “[s]oliciting signatures . . . pose[s] a significantly greater risk of interfering with normal business operations when those activities are conducted in close proximity to the entrances and exits of individual stores rather than in the less heavily trafficked and more congenial common areas.”[10] Ralphs Grocery Co., 55 Cal. 4th at 1092. Cf. J.M.B. Realty Corp., 138 N.J. at 374 (where property stands alone, “exercise of free speech will generate greater interference with their normal use”). The right to solicit signatures cannot truly be exercised “unobtrusively]” when it is done so directly in front of the only ingress and egress of a freestanding store. See Batchelder I, 388 Mass. at 92. Although the art. 9 right, as has been noted, is narrower than the right to free speech, a single, freestanding store may nonetheless suffer an impact or interference from its exercise, particularly if it serves to stifle the prop *775 erty owner’s exercise of its own property or speech rights.
The solutions the court proposes for overcoming perceived indorsement and commercial interference do not cure these concerns. See ante at 760. There are numerous reasons why posting disclaimers would be impracticable or undesirable for property owners, and time, place, and manner restrictions can go only so far in countering perceived indorsement and interference while still being minimal and reasonable limitations on the solicitation right. Cf. PruneYard, 447 U.S. at 96 (Powell, J., concurring in part and in the judgment) (“Even large establishments may be able to [demonstrate] . . . substantial annoyance to customers” of exercise of free speech right “that could be eliminated only by elaborate, expensive, and possibly unenforceable time, place, and manner restrictions”). These important considerations as to the burden on the owner of property occupied by a stand-alone store have led courts in other States employing nearly identical balancing tests to find the balance tipped decidedly in favor of the owner’s rights.
The consequences of today’s decision are significant. Aside from swinging the pendulum too far in favor of the exercise of individual rights at the expense of those of property owners, the court’s decision offers an unworkable test in several respects. No retail store except the smallest, most highly specialized one can safely determine that it falls outside the scope of the art. 9 right. All other property owners must interpret the sweeping strokes and muddied reasoning of the court’s decision to parse whether they are obligated to respect an individual’s exercise of the art. 9 right in any common or outdoor areas, even when that exercise interferes with their own constitutional rights or with the livelihood of their commercial enterprise, and even when, under an appropriate analysis, their rights as property owners would rightfully trump those of their visitors. To preserve their independence from perceived indorsement and to ensure a safe and easy shopping experience for other customers, property owners will need to craft careful time, place, and manner restrictions that minimize interference. See Batchelder I, 388 Mass. at 92-93.
In addition, in determining whether they must permit solicitation activity and the extent to which they may restrict such activity, property owners will be inclined to err on the side of caution where the court creates today the likelihood that, if the business makes the incorrect calculation, it will owe compensatory money damages under the Massachusetts Civil Rights Act *776 (act) to the aggrieved individual. See G. L. c. 12, § 11I. It is worth repeating that we have consistently avoided reading the act as creating a “vast constitutional tort” by recognizing actionable conduct in only very limited circumstances. Bally v. Northeastern Univ., 403 Mass. 713, 718 (1989), quoting Bell v. Mazza, 394 Mass. 176, 182 (1985). See Freeman v. Planning Bd. of W. Boylston, 419 Mass. 548, 564, 565-566, cert. denied, 516 U.S. 931 (1995). But the court’s decision opens the door for a host of claims under the act where they are unwarranted.
In vastly expanding the realm of private properties on which the art. 9 right may be exercised, and in interpreting the requirements for a successful claim under the Massachusetts Civil Rights Act in this way, the court creates a burdensome and unnavigable standard for property owners. This holding goes too far in eroding the rights of property owners to use their property for commercial endeavors without undue interference. Because I believe that the exercise of the art. 9 right on private property should be limited to properties that serve as the functional equivalent of a traditional downtown area, and that the Roche Bros, supermarket at issue here does not so serve, I would affirm the grant of Roche Bros.’ motion to dismiss on all grounds.

That some jurisdictions employ this functional equivalence test to determine whether the conduct of a private property owner constitutes State action for the purposes of a constitutional rights analysis is not problematic. See ante at note 6. Where we are concerned with private property owners who lure the public from downtown areas by providing a full and nearly identical spectrum of services and resources without providing the individual rights typically afforded in public spaces, the analytical framework employed to determine when a private actor is behaving like a State actor is particularly fitting.

The court rejects Roche Bros.’ reliance on California decisional law as a guidepost for the legal analysis here because the right to solicit signatures there is based in the right to free speech, which confers along with it a host of other rights. See ante at 760-762. The court notes that because the art. 9 right is less intrusive in its exercise and less broad in scope, it should extend to more areas than the free speech right. See ante at 755-756. I am not convinced that the balancing must be conducted any differently, or that the result cannot be instructive, where the factual scenarios and the ultimate “speech” sought are so similar to those of the case at hand. There is no reason why the basis of the right should preclude our comparison where the ultimate right sought, the right to solicit signatures, is the same. Further, Batchelder v. Allied Stores Int’l, Inc., 388 Mass. 83, 87-88, 90-91 (1983) (Batchelder I), and cases cited, clearly relied on California and United States Supreme Court precedent in articulating the analytical framework for the art. 9 right. Despite emphasizing the unique need for personal contact in soliciting signatures and the narrow scope of the right as compared to free speech rights more generally, see Batchelder I, supra at 91-92, the Batchelder I court indicated no substantive difference based on the origin of the right meriting a different analytical framework. Accordingly, I consider the decisional law of California and other States that have similarly rooted their right to solicit signatures in their State constitutional free speech provisions to be more persuasive than not.

 As the Supreme Court of New Jersey observed, “The hope is that once there they will spend. The certainty is that if they are not there they will not.” New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp., 138 N.J. 326, 358 (1994), cert. denied sub nom. Short Hills Assoc. v. New Jersey Coalition Against War in the Middle East, 516 U.S. 812 (1995).

A mall need not be enclosed to serve this purpose, and indeed, current commercial developments employ an outdoor shopping concept that even more closely resembles the historic Main Street. As but two examples, the recently developed The Street in Chestnut Hill and Legacy Place in Dedham are both designed with the clear intention of replicating Main Street. The Street blurs the line between commercial and noncommercial purposes by offering a wide range of high-end retail stores intermixed with restaurants, a medical center, a movie *770 theater, a bank, an optician, hair salons, a large supermarket, a fitness facility, and common areas for rest and relaxation. It encourages visitors to bring their pets and hosts a variety of concerts, yoga classes, and other activities with no purchase required. Similarly, Legacy Place offers extensive retail, food, and entertainment options, and a wide variety of children’s workshops and free concerts.

There is no indication on the record before us of how many visitors the supermarket receives each week, what its gross annual or weekly sales are, whether the supermarket offers any programming or social events, or whether there are any common areas in the store.

Even if Roche Bros, were to provide other amenities not specifically identified in the complaint, they most likely would be in furtherance of its explicit commercial purpose of inviting the public to shop there. A pharmacy, a movie rental facility, photograph printing services, a United States mail box, lottery ticket sales, small children’s rides outside the entrance, public payphones, or any number of other, small-scale services are all amenities of convenience, ancillary to the primary purpose of shopping for groceries and other household items. They render it more likely that a customer will choose to shop for groceries at this store instead of another option; they do not signal to the public that they should come to the store to engage in noncommercial activities. See Fred Meyer Stores, Inc. v. Garrett, 191 Or. App. 582, 585-586 (2004).

 Although the court assures us that its holding does not extend to “small-scale general stores,” see ante at note 9, it provides no further guidance as to where exactly it would draw the line.

There is a key distinction between the inventory of a single store and the over-all collection assembled within a large shopping mall. A large mall intentionally brings together numerous tenants to cater to a range of different types of customers. In so doing, it creates common spaces between these stores that then serve as points of congregation and replicate a downtown area.

This is indeed what makes the location so appealing to those seeking signatures.

In contrast, perceived indorsement concerns are minimal if not nonexistent at large shopping malls with hundreds of tenants. Where many malls carry a name that is localized (e.g., Northshore Mall, Natick Mall) or catchy (e.g., Assembly Row, Legacy Place), only the most informed visitor would know the identity of the mail’s owner. Further, because large malls contain “numerous separate business establishments” and numerous entrances, it is unlikely that permitting the solicitation of signatures would impair the value or use of the property as a mall or interfere with normal business operations. See PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 83 (1980); Robins v. Pruneyard Shopping Ctr., 23 Cal. 3d 899, 910-911 (1979).