GEORGE, C. J.
I respectfully dissent.
*518 The generic advertising component of the California Plum Marketing Program challenged in this case is for all relevant purposes identical to the component that has been a part of numerous similar marketing programs that have existed throughout the nation for more than 60 years, compelling all business enterprises in a particular industry to pay their fair share of the cost of generic, nonpolitical, and nonideological advertising of their agricultural products. As the majority recognizes, the challenged program also is for all relevant purposes identical to the generic advertising program that the United States Supreme Court, only three years ago, upheld in Glickman v. Wileman Brothers & Elliott, Inc. (1997) 521 U.S. 457 [117 S.Ct. 2130, 138 L.Ed.2d 585] (Glickman) against a challenge under the First Amendment of the federal Constitution. Although I agree with the majority that the protection afforded by article I, section 2, subdivision (a) of the California Constitution (hereafter article I, section 2(a) or the free speech provision) is independent of and in some contexts greater than that provided by the federal Constitution under the First Amendment, I believe the majority has failed to demonstrate that the state constitutional provision imposes greater restraint on the state’s authority than its federal counterpart in the context presented by this case.
As I shall explain, other jurisdictions whose state constitutions contain free speech provisions similar to California’s have interpreted their constitutional provisions as not restricting the respective state’s, authority to regulate commercial speech any more than does the federal Constitution. In my view, there is no basis, either in the language or the history of California’s constitutional provision, that would justify interpreting article I, section 2(a) so as to afford an agricultural producer a greater right under the state Constitution than under the federal Constitution to obtain “free rider” status with respect to such generic advertising, i.e., to permit a producer to obtain the benefits from the generic advertising created under the marketing order without paying its fair share of the cost of such advertising.
Moreover, even if I were to agree with the majority that we should reject the reasoning of Glickman, supra, 521 U.S. 457, and hold that the marketing program here at issue “implicates” (maj. opn., ante, at p. 476) the state constitutional right of free speech under article I, section 2(a), I would not remand this matter to the Court of Appeal to require that court first to determine, and then to apply, the correct standard of review for evaluating the validity of the marketing order’s impingement upon plaintiff’s state constitutional right to free speech. Instead, I would hold that any impingement is subject to review pursuant to the test set out in Abood v. Detroit Board of Education (1977) 431 U.S. 209 [97 S.Ct. 1782, 52 L.Ed.2d 261] {Abood) and Keller v. State Bar of California (1990) 496 U.S. 1 [110 S.Ct. *519 2228, 110 L.Ed.2d 1] (Keller), and further that, under that standard, the challenged plum marketing program does not violate article I, section 2(a).
I.
A.
In Glickman, supra, 521 U.S. 457, the United States Supreme Court, in an opinion authored by Justice Stevens and joined by Justices O’Connor, Kennedy, Ginsburg and Breyer, held that the First Amendment is not implicated by a federal marketing order issued pursuant to the Agricultural Marketing Agreement Act of 1937 (Act of June 3, 1937, ch. 296, 50 Stat. 246 et seq. as amended, codified at 7 U.S.C. § 601 et seq.) that required an agricultural business to contribute to the costs of generic advertising of tree fruits. In reaching its decision, the court in Glickman emphasized the context of the compulsory advertising program, noting that the industry was thoroughly regulated and “collectivized” in numerous respects. The court observed: “[The tree fruits] are marketed pursuant to detailed marketing orders that have displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws. The business entities that are compelled to fund the generic advertising at issue in this litigation do so as a part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme. It is in this context that we consider whether we should review the assessments used to fund collective advertising, together with other collective activities, under the standard appropriate for review of economic regulation or under a heightened standard appropriate for the review of First Amendment issues." (Glickman, supra, 521 U.S. at p. 469 [117 S.Ct. at p. 2138].)[1]
*520 The court in Glickman, supra, 521 U.S. 457, proceeded to 'explain that “[t]hree characteristics of the regulatory scheme at issue distinguish it from laws that we have found to abridge the freedom of speech protected by the First Amendment.” (Id., at p. 469 [117 S.Ct. at p. 2138].)
First, the court observed that fruit producers and handlers are not prevented from promulgating their own advertisements, and hence communicating their own message, to any audience. (Glickman, supra, 521 U.S. 457, 469 [117 S.Ct. 2130, 2138].) The court rejected the argument that the “assessments for generic advertising impinge on . . . First Amendment rights because they reduce the amount of money that producers have available to conduct their own advertising.” (Id., at p. 470 [117 S.Ct. at p. 2138].) The court explained: “This is equally true, however, of assessments to cover employee benefits, inspection fees, or any other activity that is authorized by a marketing order. The First Amendment has never been construed to require heightened scrutiny of any financial burden that has the incidental effect of constraining the size of a firm’s advertising budget. The fact that an economic regulation may indirectly lead to a reduction in a handler’s individual advertising budget does not itself amount to a restriction on speech.” (Ibid.)
Second, the court in Glickman noted that no fruit producer or handler is compelled to engage in any actual or symbolic speech. (Glickman, supra, 521 U.S. 457, 469 [117 S.Ct. 2130, 2138].) The court rejected the contrary argument: “Our compelled speech case law ... is clearly inapplicable to the regulatory scheme at issue here. The use of assessments to pay for advertising does not require respondents to repeat an objectionable message out of their own mouths, [citation], require them to use their own property to convey an antagonistic ideological message, [citations], force them to respond to a hostile message when they ‘would prefer to remain silent,’ *521 [citation], or require them to be publicly identified or associated with another’s message, [citation]. Respondents are not required themselves to speak, but are merely required to make contributions for advertising. With trivial exceptions on which the court [below] did not rely, none of the generic advertising conveys any message with which respondents disagree. Furthermore, the advertising is attributed not to them, but to the California Tree Fruit Agreement or ‘California Summer Fruits.’ ” (Id., at pp. 470-471 [117 S.Ct. at p. 2139], fn. omitted.)
Finally, the court in Glickman observed that the regulatory scheme differed from laws that have been found to implicate free speech rights, because in the case before it the generic commercial advertising did not force any producer or handler to endorse or finance political or ideological views with which he or she disagrees. (Glickman, supra, 521 U.S. 457, 469-470 [117 S.Ct. 2130, 2138-2139].) The court acknowledged, however, that “[a]l-though this regulatory scheme may not compel speech as recognized by our case law, it does compel financial contributions that are used to fund advertising. . . . [J]ust as the First Amendment prohibits compelled speech, it prohibits—at least without sufficient justification by the government— compelling an individual to ‘render financial support for others’ speech.’ [Citation.] However, Abood[, supra, 431 U.S. 209], and the cases that follow it, did not announce a broad First Amendment right not to be compelled to provide financial support for any organization that conducts expressive activities. Rather, Abood merely recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with one’s ‘freedom of belief.’ 431 U.S., at 235.” (Glickman, supra, 521 U.S. at p. 471 [117 S.Ct. at p. 2139].)[2]
The court in Glickman continued: “[Requiring respondents to pay the assessments cannot be said to engender any crisis of conscience. None of the advertising in this record promotes any particular message other than encouraging consumers to buy California tree fruit. . . . [^] Moreover, rather *522 than suggesting that mandatory funding of expressive activities always constitutes compelled speech in violation of the First Amendment, our cases provide affirmative support for the proposition that assessments to fund a lawful collective program may sometimes be used to pay for speech over the objection of some members of the group.” (Glickman, supra, 521 U.S. 457, 472-473 [117 S.Ct. at pp. 2139-2140].) The high court stressed that “ ‘Abood held that a union could not expend a dissenting individual’s dues for ideological activities not “germane” to the purpose for which compelled association was justified: collective bargaining.’ ” (Id., at p. 473 [117 S.Ct. at p. 2140].) The opinion in Glickman also noted that in Keller, supra, 496 U.S. 1 (a case involving bar association activities), the court had found that “ ‘the compelled association and integrated bar [were] justified by the State’s interest in regulating the legal profession and improving the quality of legal services’ ” and had concluded that “ ‘[t]he State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity.’ ” (Glickman, supra, 521 U.S. at p. 473 [117 S.Ct. at p. 2140], quoting Keller, supra, 496 U.S. at pp. 13-14 [110 S.Ct. at pp. 223S-2236].)[3] The court in Glickman found the Keller test “clearly satisfied” in the case before it, “because (1) the generic advertising of California [tree fruit] is unquestionably germane to the purposes of the marketing orders and, (2) in any event, the assessments are not used to fund ideological activities.” (Glickman, supra, 521 U.S. at p. 473 [117 S.Ct. at p. 2140], fn. omitted.)
Summarizing its review of the three distinguishing characteristics discussed above, the court concluded in Glickman: “[N]one of our First Amendment jurisprudence provides any support for the suggestion that the promotional regulations should be scrutinized under a different standard from that applicable to the other anticompetitive features of the marketing orders.” (Glickman, supra, 521 U.S. 457, 470 [117 S.Ct. 2130, 2138].) Based upon the highly regulated and collectivized context of the compulsory advertising program, and negative findings on the three factors mentioned above, the court in Glickman found the marketing program to be “a species of economic regulation” (id., at p. 477 [117 S.Ct. at p. 2142]) outside the reach of the First Amendment, and subject to mere rational basis review.
Despite the majority’s criticisms of Glickman (maj. opn., ante, at pp. 499-505), it has failed to demonstrate that the high court was wrong in *523 finding that, in this heavily regulated setting, the First Amendment is not implicated by the compelled funding of generic advertising through a marketing order, and that such an order in this setting is merely “a species of economic regulation.” (Glickman, supra, 521 U.S. 457, 477 [117 S.Ct. 2130, 2142].)[4]
B.
Before and soon after adoption of the federal Agricultural Marketing Agreement Act of 1937 at issue in Glickman, supra, 521 U.S. 457, numerous states enacted similar measures—most of which are in effect today in codified and superseding or amended form—providing, among other things, for assessments on many kinds of agricultural commodities, to fund generic advertising for those commodities. (E.g., 1935 Fla. Laws, chs. 16854-16858; 1937 Idaho Sess. Laws, ch. 252, §§ 1-21; 1939 Mich. Pub. Acts, No. 87, §§ 1-16; 1939 Colo. Sess. Laws, ch. 66, §§ 1-20; 1942 La. Acts, No. 294, §§ 1-10; 1937 Me. Laws, ch. 84, §§ 1-13; 1945 Neb. Laws, ch. 4, §§ 1-12.)[5] California’s version—the California Marketing Act of 1937, added by Statutes 1937, chapter 404, section 1, page 1329 et seq., codified at Food and Agricultural Code, section 58601 et seq. (CMA or Act)—is substantially similar to the other state and federal acts. The ensuing “California Plum Marketing Program” here under review is likewise substantially similar to other marketing programs that have existed for decades throughout the nation.
The California Act, like the federal legislation and that of many other states, creates a highly regulated environment that restricts the freedom of producers and handlers to act independently, for example by setting quality and ripeness standards for the marketing of products. In addition, and pertinent to our present inquiry, the California Act—again like the federal legislation and that of many other states—expressly permits issuance of marketing orders for advertising campaigns regarding agricultural commodities grown in California, funded by compelled contributions. (Food & Agr. Code, §§ 58889, 58921.) Like producers and handlers under the federal program at issue in Glickman, and like those operating under other programs that have existed for decades throughout the nation, producers and handlers of California plums have been compelled, through a resulting state-issued *524 marketing order, to fund[6] generic advertising “as a part of a broader collective enterprise.” (Glickman, supra, 521 U.S. 457, 469 [117 S.Ct. 2130, 2140].)[7]
As the majority acknowledges, the state legislation and the marketing program here at issue are not materially different from the program approved in Glickman. (Maj. opn., ante, at pp. 507-508, 516.) The majority provides a partial description of this regulatory context (maj. opn., ante, at pp. 478-480), but I believe that it is helpful to emphasize the regulatory scheme in greater detail, and hence quote below extensively from the Court of Appeal majority’s decision in this case:
“The point of these [the state and federal marketing] programs is not simply to regulate the market; the point is to preserve the agricultural industry. The laws reflect a long-standing political judgment that ‘agriculture’—unlike bicycle manufacturing or clothing production, for example—cannot be allowed to disappear from the American economy because of untrammeled market forces . . . .[8]
“In this context, it is worth repeating at length the legislative findings that form the basis of the exercise of the police power of the state in the Act: ‘It is hereby declared that the marketing of commodities in this state in excess *525 of reasonable and normal market demands therefor; disorderly marketing of such commodities; improper preparation for market and lack of uniform grading and classification of commodities; unfair methods of competition in marketing of commodities; and the inability of individual producers to maintain present markets or to develop new or larger markets for California-grown commodities, result in an unreasonable and unnecessary economic waste of the agricultural wealth of this state.’ (Food & Agr. Code, § 58651.) The foregoing described the result of unrestrained competition in the marketing of perishable commodities; the Legislature then stated that ‘[t]hese conditions vitally concern the health, peace, safety and general welfare of the people of this state.’ (Food & Agr. Code, § 58652.)[9]
“. . . [T]he California marketing order [here at issue] ‘insure[s] maturity, grade and accurate size labeling,’ in addition to providing mandatory funding of generic advertising. . . . [I]t is apparent from the foregoing legislative findings that maturity, grade and labeling standards directly displace the ability to compete using the traditional methods of different ‘. . . preparation for market and . . . [individualized] grading and classification of agricultural commodities.’ . . . [¶] . . . [¶]
“It is rational to control prices as a way to ensure both demand for the product and a supply of the product [citation]; it is rational to control supply to ensure a demand sufficient to return a fair price [citation]; and it is rational to stimulate demand so that the amount produced by suppliers brings a fair price. In each case, the fundamental assumption of unrestrained competition—that supply and demand together set the price in a free market—is replaced with an assumption that regulatory modification of the market—of supply and/or demand—is necessary in the public interest.
“This is the sense in which the [Glickman] majority characterized the generic advertising campaign as not violating free speech protections, but merely as one of a number of available tools imbedded in a comprehensive *526 regulatory program ‘that impose[s] restraints on competition that arguably disadvantage particular producers for the benefit of the entire market.’ ([Glickman, supra,] 521 U.S. at p. 474 . . . , fn. omitted.) . . . [T]he point [of the Glickman majority] is that the advertising tool merely seeks to accomplish the same goals as equally or more invasive tools, such as price, quantity, quality and labeling restrictions; no greater weight should be given to the fact that the advertising tool involves an activity that, in other contexts, is ‘commercial speech’ protected by the First Amendment.” (Fns. omitted, italics added.)

\ •*

It is clear that the present case presents itself in essentially the same heavily regulated context that the majority in Glickman found to be highly pertinent to its inquiry under the free speech clause of the First Amendment.
II.
The Secretary of Food and Agriculture of the State of California argues that although our state Constitution has independent force and we are not bound by the United States Supreme Court’s interpretation of corresponding provisions of the federal Constitution, nevertheless, pursuant to People v. Teresinski (1982) 30 Cal.3d 822 [180 Cal.Rptr. 617, 640 P.2d,753] (Teresinski), we should give Glickman “respectful consideration” and follow it under our own charter “unless persuasive reasons are presented for taking a different course.” (Teresinski, supra, 30 Cal.3d at p. 836.) The majority implicitly concedes that pursuant to Teresinski, unless there are cogent reasons not to follow Glickman’s conclusion, we should adopt the high court’s approach in construing our own free speech clause, and hold that article I, section 2(a) is not implicated by the generic advertising component of the comprehensive state-mandated commercial marketing program.
The majority discusses the factors that we identified in Teresinski, supra, 30 Cal.3d 822, 836-837, as relevant to whether we should construe a state constitutional provision consistently with federal construction of a corresponding provision of the federal charter, and concludes that, on balance, we should not follow the federal approach here. (Maj. opn., ante, at pp. 510-514.) I am not persuaded. I shall address the four factors in order.
A.
Does the language or history of article I, section 2(a) suggest that the issue before us should be resolved differently from the way it was resolved under the First Amendment in Glickman? (Teresinski, supra, 30. Cal.3d 822, 836.) The majority concludes that this factor weighs in favor of rejecting Glickman and *527 finding that the marketing program challenged here implicates article I, section 2(a) of our state charter.
If we were to consider article I, section 2(a)’s words in isolation, without regard to the provision’s history, and without considering the highly regulated context of the program here at issue, I might agree with the majority that the program presently challenged “implicates” article I, section 2(a). But it is not appropriate to consider the text of the state constitutional provision in isolation—we must consider it along with its history and context. In this regard, I emphasize the following:
1.
The majority asserts that “[a]s a general rule,” article I, section 2(a)’s “right to freedom of speech” is “broader” and “greater” than that provided under the First Amendment, and that only in exceptional circumstances does the state provision fail to afford greater or broader free speech rights. (Maj. opn., ante, at pp. 491-492.) Because the proper application of the state free speech clause necessarily must be determined on a case-by-case basis, I am not convinced that it is helpful to attempt to quantify the question in terms of a “general rule.” Nevertheless, on the basis of past decisions, it is incorrect to suggest that in all but exceptional circumstances the state Constitution provides greater or broader protection for speech than does the First Amendment. Instead, at least in the numerous areas that have been litigated, California decisions applying the state free speech clause have more often than not concluded that the state provision affords no greater protection than that afforded by the First Amendment.
For example, recently in Los Angeles Alliance for Survival v. City of Los Angeles (2000) 22 Cal.4th 352 [93 Cal.Rptr.2d 1, 993 P.2d 334] {Los Angeles Alliance), although emphasizing that our free speech clause is written in terms broader than the First Amendment, we held that our provision offers no greater protection of “solicitation speech,” and that our state standard for determining the validity of anti-solicitation laws is the same as the federal test. (At pp. 365-379.)
Similarly, for the past half-century, we have interpreted article I, section 2(a), (or its substantively identical predecessors) in numerous other contexts, as affording comparable but no greater protection for speech than that provided under the First Amendment. (See, e.g., Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 745-746 [257 Cal.Rptr. 708, 771 P.2d 406], and cases cited [applying First Amendment standards in defamation action under article I, section 2(a), and holding that the state provision does not *528 impose greater obstacles to recovery than what is required by the First Amendment]; Leoni v. State Bar (1985) 39 Cal.3d 609, 614, fn. 2, 622-628 [217 Cal.Rptr. 423, 704 P.2d 183] [upholding under both First Amendment and article I, section 2(a), with no different analysis for the state law claim, discipline imposed for certain unsolicited and misleading attorney advertising]; Metromedia, Inc. v. City of San Diego (1980) 26 Cal.3d 848, 866-871 [164 Cal.Rptr. 510, 610 P.2d 407] [upholding under both First Amendment and article I, section 2(a), with no different analysis for the state law claim, a city’s ban on off-site advertising billboards], revd. sub nom. Metromedia, Inc. v. San Diego (1981) 453 U.S. 490 [101 S.Ct. 2882, 69 L.Ed.2d 800]; Loska v. Superior Court (1986) 188 Cal.App.3d 569, 581-584 [233 Cal.Rptr. 213] [upholding under both First Amendment and article I, section 2(a), with no different analysis for the state law claim, ordinance prohibiting scalping by commercial ticket sellers on public property]; In re Mares (1946) 75 Cal.App.2d 798, 802-805 [171 P.2d 762] [upholding under both First Amendment and predecessor to article I, section 2(a), with no different analysis for the state law claim, ordinance prohibiting sidewalk solicitation of magazine subscriptions]; Pittsford v. City of Los Angeles (1942) 50 Cal.App.2d 25, 27, 29-39 [122 P.2d 535] [upholding under both First Amendment and predecessor to article I, section 2(a), with no different analysis for the state law claim, ordinance prohibiting sidewalk distribution of commercial handbills]; see also Wirta v. Alameda-Contra Costa Transit Dist. (1967) 68 Cal.2d 51, 54, 57 [64 Cal.Rptr. 430, 434 P.2d 982] [noting that “[a] long line of decisions has established the rule that commercial messages do not come within the orbit of the First Amendment,” and failing to suggest any different rule under the state Constitution].)
To be sure, we have held that article I, section 2(a) protects speech activity that the First Amendment does not. (Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 908-910 [153 Cal.Rptr. 854, 592 P.2d 341] [recognizing a right of free speech in privately owned large shopping center].) But in light of the numerous cases cited above, upholding various regulations under both the First Amendment and our state’s free speech provision, with no different analysis for the state law claim, this hardly supports the majority’s assertion that as a general rule, and absent exceptional circumstances, article I, section 2(a), provides speech protection that is broader or greater than that afforded under the First Amendment.
2.
California has had for more than 150 years the same core language in article I, section 2(a)—the declaration that “[e]very person may freely speak, write and publish his or her sentiments on all subjects.” The majority asserts *529 that this language affords greater protection to commercial speech than does the First Amendment.
We have not been cited to any California decision prior to 1942 (when the United States Supreme Court held there was no First Amendment protection for commercial speech in Valentine v. Chrestensen (1942) 316 U.S. 52, 54-55 [62 S.Ct. 920, 921-922, 86 L.Ed. 1262]), that recognized under article I, section 2(a)’s predecessors any greater protection for commercial speech than that afforded by the First Amendment. From the filing of Valentine v. Chrestensen in 1942, until 1976, when the high court reversed itself and found that cbmmercial speech enjoys some constitutional protection, subject to police power regulation (Va. Pharmacy Bd. v. Va. Consumer Council (1976) 425 U.S. 748, 770-773 [96 S.Ct. 1817, 1829-1831, 48 L.Ed.2d 346]), our courts followed federal high court cases in upholding various commercial speech regulations. (See, e.g., In re Mares, supra, 75 Cal.App.2d 798, 802-805.) Likewise, since 1976 no California decision has suggested that California’s protection of commercial speech is different in any respect from that provided under the First Amendment. (See, e.g., Leoni v. State Bar, supra, 39 Cal.3d 609, 614, fn. 2, & 622-628; Metromedia, Inc. v. City of San Diego, supra, 26 Cal.3d 848, 866-871; Loska v. Superior Court, supra, 188 Cal.App.3d 569, 581-584; People v. Superior Court (Olson) (1979) 96 Cal.App.3d 181, 195 [157 Cal.Rptr. 628].) This history suggests that it would be quite suspect now to read into article I, section 2(a), an expansive protection of commercial speech that the California courts have failed to discern.[10] Again, the cases demonstrate that although our free speech clause is written in terms broader than the First Amendment, California courts nevertheless have long interpreted it as providing no greater protection for commercial speech than is afforded by the First Amendment.
*530 3.
Finally, at least 40 other states have constitutional provisions with language that is substantively akin to that contained in the free speech provision of article I, section 2(a). (See Los Angeles Alliance, supra, 22 Cal.4th 352, 366, fn. 10.) Nothing in the briefs filed in this case, or in the majority opinion, suggests that the history and treatment of the provisions in those states differs significantly from the history and treatment in ours. It appears that until the United States Supreme Court held in 1976 that commercial speech is entitled to some level of protection under the First Amendment, in the few instances in which a state constitutional free speech provision was advanced as a basis for challenging a law, the courts of these other jurisdictions simply followed high court decisions in upholding various state regulations of commercial speech. (E.g., Planned Parenthood Committee v. Maricopa County (1962) 92 Ariz. 231 [375 P.2d 719]; State v. Lambert (1975) 68 Wis.2d 523 [229 N.W.2d 622].) Although sister state decisions since 1976 regularly contain general comments to the effect that the language of their provision is “broader” than that of the First Amendment (see cases cited in Los Angeles Alliance, supra, 22 Cal.4th 352, 366), most jurisdictions—like our own (see ante, at pp. 525-526)—have in practice interpreted their provisions as providing protection coextensive with the First Amendment. (E.g., State v. Wicklund, supra, 589 N.W.2d 793, 799 [observing that numerous other states with “virtually identical language have interpreted the free speech provisions of their constitutions as coextensive with that of the First Amendment”]; see also id., at p. 799, fn. 5 [citing cases].) With the possible exception of cases from Oregon,[11] no decision of which I am aware from these other states has held that the state protection of commercial speech is greater than that provided by the First Amendment,[12] and a number of *531 decisions have concluded otherwise.[13] Finally, like California, numerous other states long have had substantially similar agricultural marketing programs that have included compelled funding of generic advertising (see ante, at p. 523), and in many of those jurisdictions courts have entertained and rejected diverse constitutional challenges to such programs. (E.g., C. V. Floyd Fruit Co. v. Florida Citrus Commission (1937) 128 Fla. 565 [175 So. 248, 112 A.L.R. 562];[14] State v. Enking (1938) 59 Idaho 321 [82 P.2d 649]; Miller v. Michigan State Apple Commission (1941) 296 Mich. 248 [296 N.W. 245];[15] Louisiana State Department of Agriculture v. Sibille (1945) 207 La. 877 [22 So.2d 202]; Wickham v. Trapani (1966) 26 A.D.2d 216 [272 N.Y.S.2d 6]; see also Swisher v. Brown (1965) 157 Colo. 378 [402 P.2d 621, 628] [noting that 21 states had upheld similar marketing acts].) Although amicus curiae participation in the present case has been extensive, no case from any of these numerous jurisdictions[16] has been brought to our attention suggesting, much less holding, that a state constitution’s free speech clause provides protection for commercial speech in the context here at issue, i.e., when a person or entity (i) properly is required to associate with other business enterprises in conjunction with a regulatory scheme, and (ii) is required, in conjunction with that regulatory scheme, to help fund generic, nonpolitical, and nonideological commercial advertising that is germane to the purpose of the compelled association.[17]
*532 This considerable history, and the absence of a holding from any other state similar to the one proposed by today’s majority, suggest it would be inappropriate to now read into article I, section 2(a), rights with respect to commercial speech that numerous other courts in numerous other analogous jurisdictions previously have failed to recognize. I believe that this first Teresinski factor militates in favor of following the approach set out in Glickman.
B.
The final three Teresinski factors yield the same conclusion.
Does the federal decision in question overrule precedent or limit previously established rights under the United States Constitution? (Teresinski, supra, 30 Cal.3d 822, 836.) As the majority recognizes, the answer is “no.” (Maj. opn., ante, at pp. 511-512.) This factor militates in favor of following the approach set out in Glickman.
Was the decision unanimous, and has it inspired “incisive academic criticism”? (Teresinski, supra, 30 Cal.3d 822, 836-837, italics added.) Glickman was closely divided and, like many high court opinions, it has been criticized, although it may be doubted whether the academic literature reflects the kind of incisive criticism contemplated in Teresinski.[18] As the majority recognizes, the result reached by Glickman also has support in the academic community. (Maj. opn., ante, at p. 504.) On the whole, this third factor does not provide a strong basis for declining to follow the reasoning of Glickman.
The last Teresinski factor presents the question: if Glickman is followed by our courts, would it overturn established California doctrine affording greater *533 rights under article I, section 2(a)? (Teresinski, supra, 30 Cal.3d 822, 837.) The majority again admits that the answer is “no.” (Maj. opn., ante, at p. 511.) As explained above, and as the majority acknowledges (id., at p. 496, fn. 6), there is no California precedent to overturn, because before today’s holding there simply was no decision establishing greater commercial rights under the state provision than are provided under the First Amendment. Further, although agricultural marketing programs, with their generic advertising components, have been in existence in California for many decades, no California decision has suggested that such programs pose constitutional problems under article I, section 2(a).
Accordingly, I conclude, contrary to the majority’s assertion, that the four Teresinski factors militate in favor of adopting Glickman's approach in construing article I, section 2(a).
III.
As just explained, I am not convinced that we should disavow Glickman in construing our free speech provision. If we were to follow Glickman here, we would conclude that article I, section 2(a) is not implicated by the challenged marketing program.
Nevertheless, the majority holds that article I, section 2(a) is implicated by the plum marketing program. Having so concluded, however, the majority leaves for the Court of Appeal the task of attempting to resolve, on remand, whether the program actually violates the state Constitution. This issue was fairly raised in the petition for review, it is well addressed in the briefs, and the majority fails adequately to explain why this court should not also determine the standard of review and then apply that standard in order to decide whether the state free speech provision is violated here.
Gerawan proposes application of the test originally set out in Central Hudson Gas & Elec. v. Public Serv. Comm’n (1980) 447 U.S. 557 [100 S.Ct. 2343, 65 L.Ed.2d 341] (Central Hudson), which evaluates the validity of regulations restricting commercial speech under the following four-part approach: (i) is the expression constitutionally protected (if it is misleading or concerns illegal activity, it is not protected at all); (ii) does the regulation serve a “governmental interest” that is “substantial”; (iii) does the regulation “directly advance” such an interest; and (iv) is the regulation “not more extensive than . . . necessary”? (Id., at p. 566 [100 S.Ct. at p. 2351]; see *534 also Bolger v. Youngs Drug Products Corp. (1983) 463 U.S. 60, 68-69 [103 S.Ct. 2875, 2881-2882, 77 L.Ed.2d 469].)[19]
The majority in Glickman, supra, 521 U.S. 457, stated that had it concluded that free speech rights were implicated in the case before it, the appropriate standard of review would not be that set out in Central Hudson, supra, 447 U.S. 557, but instead the test used in Abood, supra, 431 U.S. 209, and Keller, supra, 496 U.S. 1, both of which addressed the compelled funding of speech. (Glickman, supra, 521 U.S. 457, 473 & 474, fn. 18 [117 S.Ct. 2130, 2141].)[20] In Abood and Keller the high court was forced to determine whether it is permissible to compel the funding of contributions from individuals properly required to associate, and against objections that such funding implicated political or ideological matters and hence violated core First Amendment rights of the persons compelled. The court in Keller, following the test first set out in Abood, approved compelled funding for State Bar activities—even those that implicated political or ideological matters—so long as (i) the compelled association was justified in the first place by the need to “regulat[e] the legal profession” and “improv[e] the quality of legal services,” and (ii) the compelled funding from mandatory dues was for activities that were “germane to those goals”—meaning that the challenged expenditures were “reasonably incurred” for those purposes. (Keller, supra, 496 U.S. 1, 13-14 [110 S.Ct. 2228, 2235-2236].)
Consistent with the majority in Glickman, I agree that if free speech rights are implicated here, the appropriate standard of review would not be the one developed to assess restrictions on commercial speech (the Central Hudson test), but instead the test used to assess compelled funding of speech (the Abood/Keller test). (Accord, Gallo Cattle Co. v. California Milk Advisory Bd. (9th Cir. 1999) 185 F.3d 969, 976-977 (Gallo); Case Note, Constitutional Law—Forced Advertising: Free Speech or Not Even? Glickman v. Wileman Bros. & Elliott, Inc., 117 S.Ct. 2130 (1997) (1998) 33 Land & Water L.Rev. 779, 791-795 (Forced Advertising).)
Although in its phrasing the Abood/Keller test is plainly less exacting than Central Hudson’s intermediate scrutiny standard, still, as the majority in *535 Glickman implicitly reasoned, if the Abood/Keller test is sufficient for the purposes of assessing core First Amendment interests concerning compelled funding of political or ideological speech, the same test also should be quite adequate for the task here at hand, which concerns assessing the constitutional propriety of compelled funding of mere generic commercial advertising.
Under Abood and Keller as applicable in this context, I believe that our inquiry and the conclusions we draw should be as follows:
(i) Is there a legitimate basis for the compelled association? Yes. The interest in maintaining the stability of markets for California plums justifies legislation that allows producers and handlers to establish compelled associations designed to accomplish that goal, (ii) Is the generic advertising program germane to the purposes of the marketing order here at issue? Yes. One purpose of the marketing order is to create and support a market for California plums. The advertising program clearly is germane to that purpose; the costs of the advertising program are “reasonably incurred” (Keller, supra, 496 U.S. 1, 14 [110 S.Ct. 2228, 2236]) to promote that goal. (See Gallo, supra, 185 F.3d 969, 976-977; Forced Advertising, supra, 33 Land & Water L.Rev. 779, 794-795.)[21]
In summary, assuming the program here at issue implicates article I, section 2(a), it is subject to review pursuant to the Abood/Keller test, and under that test the program does not violate article I, section 2(a).
*536 Accordingly, I would affirm the unanimous judgment of the Court of Appeal, upholding the validity of the challenged marketing program under both the federal and state Constitutions.
Chin, J., and Hanlon, J.,* concurred.

The court further explained: “Congress enacted the Agricultural Marketing Agreement Act of 1937 (AMAA) ... in order to establish and maintain orderly marketing conditions and fair prices for agricultural commodities. [Citation.] Marketing orders promulgated pursuant to the AMAA are a species of economic regulation that has displaced competition in a number of discrete markets; they are expressly exempted from the antitrust laws. [Citation.] Collective action, rather than the aggregate consequences of independent competitive choices, characterizes these regulated markets. In order ‘to avoid unreasonable fluctuations in supplies and prices,’ [citation], these orders may include mechanisms that provide a uniform price to all producers in a particular market, that limit the quality and the quantity of the commodity that may be marketed, [citation], that determine the grade and size of the commodity, [citation], and that make an orderly disposition of any surplus that might depress market prices [citation]. Pursuant to the policy of collective, rather than competitive, marketing, the orders also authorize joint research and development projects, inspection procedures that ensure uniform quality, and even certain standardized packaging requirements. [Citation.] The expenses of administering such orders, including specific projects undertaken to serve the economic interests of the cooperating producers, are ‘paid from funds collected pursuant to *520 the marketing order.’ [Citation.] fl[] Marketing orders must be approved by either two-thirds of the affected producers or by producers who market at least two-thirds of the volume of the commodity. [Citation.] The AMAA restricts the marketing orders ‘to the smallest regional production areas . . . practicable.’ [Citation.] The orders are implemented by committees composed of producers and handlers of the regulated commodity, appointed by the Secretary, who recommend rules to the Secretary governing marketing matters such as fruit size and maturity levels. [Citation.] The committees also determine the annual rate of assessments to cover the expenses of administration, inspection services, research, and advertising and promotion. [Citation.] [1[] Among the collective activities that Congress authorized for certain specific commodities is ‘any form of marketing promotion including paid advertising.’ [Citation.] The authorized promotional activities, like the marketing orders themselves, are intended to serve the producers’ common interest in disposing of their output on favorable terms. The central message of the generic advertising at issue in this case is that ‘California Summer Fruits’ are wholesome, delicious, and attractive to discerning shoppers. [Citation.] All of the relevant advertising, insofar as it is authorized by the statute and the Secretary’s regulations, is designed to serve the producers’ and handlers’ common interest in promoting the sale of a particular product.” (Glickman, supra, 521 U.S. 457, 461-462 [117 S.Ct. 2130, 2134-2135], fns. omitted.)

At this point, the court explained in Glickman: “We considered, in Abood[, supra, 431 U.S. 209], whether it was constitutional for the State of Michigan to require government employees who objected to unions or union activities to contribute to an ‘agency shop’ arrangement requiring all employees to pay union dues as a condition of employment. We held that compelled contributions to support activities related to collective bargaining were ‘constitutionally justified by the legislative assessment of the important contribution of the union shop’ to labor relations. Id., at 222. Relying on our compelled-speech cases, however, the Court found that compelled contributions for political purposes unrelated to collective bargaining implicated First Amendment interests because they interfere with the values lying at the ‘heart of the First Amendment [—] the notion that an individual should be free to believe as he will, and that in a free society one’s beliefs should be shaped by his mind and his conscience rather than coerced by the State.’ Id., at 234-235; see also id., at 235.” (Glickman, supra, 521 U.S. 457, 471-472 [117 S.Ct. 2130, 2139].)

Phrased affirmatively, Keller stands for the proposition that assessments to fund a lawful collective program may be used to pay for speech over the objection of association members so long as the speech—even if ideological or political—is germane to the purposes for which the compelled association is justified.

Even if I concluded otherwise on the merits, I could not endorse the tone of the majority’s criticism of the United States Supreme Court in Glickman.

Other states subsequently enacted, or revised and reenacted, similar legislation. (See, e.g., 1955 Wash. Laws, ch. 191, §§ 1-29; 1961 Pa. Laws, No. 657, §§ 1-14; 1967 N.D. Laws, ch. 75, §§ 1-17; 1969 Ohio Laws H. No. 576; 1971 NJ. Laws, ch. 308, §§ 1-34; 1971 Iowa Acts, ch. 143, §§ 1-34.)

The assessments under the California Plum Marketing Program—like the assessments that have been imposed by other states—are calculated based upon weight of produce marketed. Currently, the assessment is set at a rate not to exceed 20 cents per 28-pound box of fruit. That sum is earmarked as follows: 2 cents for research, 7 cents for quality standards and inspections, and 11 cents for generic advertising, sales promotion, and market development.

Akin to the antitrust immunity conferred under the federal programs (see maj. opn., ante, at p. 499, fn. 7), California law expressly grants these producers and handlers a defense to any action alleging violation of state antitrust, unfair practices, unfair trade, or monopoly laws. (Food & Agr. Code, § 58655.)

The impetus for the CMA is well described in Voss v. Superior Court (1996) 46 Cal.App.4th 900, 907-908 [54 Cal.Rptr.2d 225]: “The CMA constitutes a legislative entrustment of the power to regulate the marketing of agricultural commodities to those who produce or otherwise deal with such products, subject to the approval of the secretary. (Shimomura, A New Look at the California Marketing Act of 1937 (1972) 5 U.C. Davis L.Rev. 190, 198.) It grew out of the chaotic conditions which characterized California agriculture during the early part of the twentieth century. {Id. at pp. 196-198.) Before the promulgation of the CMA, each of California’s many fruit and vegetable growers attempted to be the first in the market with his or her commodity, in order to take advantage of the premium prices paid on early shipments. This led to the marketing of inadequately ripened produce, and the glutting of the market during the peak season with poor quality commodities. Deceptive packaging, improper sampling, and false grading were often resorted to in order to attempt to enhance the attractiveness of the produce. This ‘unregulated scramble’ had an ‘adverse effect upon consumer acceptance of California fruits and vegetables,’ and the unstable and fluctuating markets ‘had an exaggerated impact on the livelihood of’ the state’s agricultural producers. {Id. at pp. 196-197.) The depression of 1929-1933 only exacerbated these problems; the prices paid to growers ‘plummeted.’ (Id. at p. 198.)”

The Legislature has described the purpose of the CMA consistent with these findings and observations. The Act is designed to: “(a) Enable [the] producers of this state ... to correlate more effectively the marketing of their commodities with market demands for those commodities. [ft] (b) Establish orderly marketing of commodities, [ft] (c) Provide for uniform grading and proper preparation of commodities for market, [ft] (d) Provide methods and means for the maintenance of present markets, or for the development of new or larger markets, for commodities that are grown within this state or for the prevention, modification, or elimination of trade barriers that obstruct the free flow of those commodities to market, [ft] (e) Eliminate or reduce economic waste in the marketing of commodities, [ft] (f) Restore and maintain adequate purchasing power for the producers of this state, [ft] (g) Inform the general public of the processes of producing agricultural commodities. [And] [ft] (h) Foster cooperation and understanding between urban and rural sectors of society.” (Food & Agr. Code, § 58654.)

I am unpersuaded by the majority’s attempts to invoke secondary historical sources as support for the conclusion that the drafters of California’s 1849 and 1879 Constitutions, and the drafters of a later revision and a later amendment to the free speech provision, had in mind the need to “protect[] commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services.” (Maj. opn., ante, at p. 494.) The majority does not point to any direct evidence (in the constitutional debates, revision records, or amendment materials, or otherwise) to support its hypothesis (see maj. opn., ante, at pp. 494-496), and it ignores the circumstance that the California drafters did not fashion a new free speech provision that fit the majority’s description of the distinctive culture of mid-19th century California, but instead simply adopted the preexisting language of the corresponding New York Constitution. I also note that the Minnesota Supreme Court in State v. Wicklund (Minn. 1999) 589 N.W.2d 793, recently conducted a similar historical review of its substantively identical provision (id., at pp. 798-799) and found “nothing from either the 1857 [D]ebates [and Proceedings of the Constitutional Convention for the Territory of Minnesota] or decisions of other states having similar or identical provisions to suggest that our state’s free speech protection was intended to be applied more broadly than its federal counterpart.” That court concluded, “[T]here is nothing inherent in the language of [the state provision] which requires more expansive protection for free speech than does the First Amendment.” (At p. 799.)

Gerawan Farming, Inc. relies upon Moser v. Frohnmayer (1993) 315 Or. 372 [845 P.2d 1284], for the proposition that the Oregon free speech clause applies equally to commercial and noncommercial speech. Moser invalidated a law that banned commercial automated telemarketing but permitted charitable or political automated telemarketing, under Oregon’s free speech clause (id., at p. 1288), which is substantively similar to article I, section 2(a). Although I do not find any explicit holding in Moser that the Oregon free speech clause applies equally to commercial and noncommercial speech, Gerawan’s interpretation of Moser is arguably supported by prior Oregon appellate court cases asserting that Oregon’s free speech provision generally does afford protection for commercial speech greater than that provided by the First Amendment, and indeed that commercial speech is entitled to the same protection as noncommercial speech (Ackerley Communications, Inc. v. Mult. Co. (1985) 72 Or.App. 617 [696 P.2d 1140] [invalidating billboard regulation]; City of Hillsboro v. Purcell (1987) 87 Or.App. 649 [743 P.2d 1119] [invalidating door-to-door commercial solicitation regulation]).

Gerawan suggests that post-1976 opinions from Pennsylvania (which has a provision substantively similar to article I, section 2(a)) support its position that our provision protects the precise kind of commercial speech here at issue. Com. v. Bd. of Physical Therapy (Pa. 1999) 728 A.2d 340, 343-344, upheld a regulation of advertising by chiropractors; Insurance *531 Adj. Bureau v. Ins. Com’r (1988) 518 Pa. 210 [542 A.2d 1317, 1324], invalidated a prohibition on solicitation of insurance adjusting business within 24 hours of a disaster or fire. I do not read these cases as supporting an assertion that Pennsylvania’s clause provides broader protection for commercial speech than does the First Amendment, and I do not believe they support Gerawan’s assertion that our own provision protects the kind of commercial speech here at issue.

E.g., State, Tp. of Pennsauken v. Schad (1999) 160 N.J. 156 [733 A.2d 1159, 1168-1170; State v. Wicklund, supra, 589 N.W.2d 793, 800-801, and cases cited; see also Nat. Fed. of Retired Persons v. Ins. Com’r (1992) 120 Wash.2d 101 [838 P.2d 680, 689]; Florida Canners Ass’n v. State, Dept. of Citrus (Fla. Dist. Ct. App. 1979) 371 So.2d 503, 517-519, affirmed by Coca-Cola Co., Food Division v. State, Dept. (Fla. 1982) 406 So.2d 1079, 1087-1088 (without mentioning state charter provision).

See also Conner v. Joe Hatton, Inc. (Fla. 1968) 216 So.2d 209 and State, Department of Citrus v. Griffin (Fla. 1970) 239 So.2d 577 (both rejecting constitutional challenges to compelled funding and advertising programs).

See also Dukesherer Farms, Inc. v. Ball (1979) 405 Mich. 1 [273 N.W.2d 877] (rejecting constitutional challenges to compelled funding and advertising program).

Including Oregon (see ante, fn. 11), which, like many other states, long has had legislation similar to that presently under review. (See Or. Rev. Stat. §§ 578.010-578.990 [Oregon Wheat Commission], 579.010-579.990 [Oregon Potato Commission].)

Perhaps the closest case on point is Florida Canners Ass’n v. State, Dept. of Citrus, supra, 371 So.2d 503, in which the court rejected a free speech challenge—based upon both the First Amendment and its Florida constitutional counterpart—to a regulation requiring citrus producers to affix a declaration (the word “Florida” or the “Florida Sunshine Tree registered certification mark”) on fruit labels, or on the ends of fruit containers. (At pp. 517-519 [employing same analysis under both charters in upholding the regulation].)

The majority does not assert that the student works that it cites reflect the requisite “incisive criticism” contemplated by Teresinski, but instead focuses upon three professional articles. The first two of these materials do not offer incisive criticism. Volume 2 of Smolla and Nimmer, Freedom of Speech (1999), much like some of the cited student works, contains primarily a detailed description of the various Glickman opinions (at § 20:45, pp. 20-106 to 20-114), after which the authors announce, in conclusory fashion and with no independent analysis, that Justice Souter’s dissent presented the better argument. (At pp. 20-114.) Fried, Perfect Freedom, Perfect Justice (1998) 78 B.U. L.Rev. 717, is even less substantive. There, at the conclusion of a wide-ranging published lecture on jurisprudential attempts to attain “perfect freedom” and “perfect justice,” the author does little more than mention, in a five-line footnote that contains no independent analysis, his disagreement with the majority in Glickman and agreement with Justice Souter’s dissent. (At p. 743, fn. 84.) The third professional work relied upon by the majority, Cásarez, Don’t Tell Me What to Say: Compelled Commercial Speech and the First Amendment (1998) 63 Mo. L.Rev. 929 (Cásarez), does indeed present a thoughtful critique of the “contextual” approach of the majority in Glickman (at pp. 960-965), but these five pages of this one work hardly constitute the kind of incisive academic criticism contemplated by Teresinski.

The principal dissenting opinion in Glickman would have applied this Central Hudson standard and found that the marketing order in that case failed that test. (Glickman, supra, 521 U.S. at pp. 491-504 [117 S.Ct. at pp. 2149-2156] (dis. opn. of Souter, J.); cf. U.S. v. Frame (3d Cir. 1989) 885 F.2d 1119, 1133-1137 [upholding different federal marketing order under Central Hudson standard].) Justice Thomas alone would have endorsed a yet “higher standard . . . applied to all speech, whether commercial or not.” (Glickman, supra, 521 U.S. at p. 504 [117 S.Ct. at p. 2155] (dis. opn. of Thomas, J.).) This aspect of Justice Thomas’s dissent has been construed as calling for strict scrutiny review. (Cásarez, supra, 63 Mo. L.Rev. 929, 959.)

In this regard (and contrary to the suggestions of various amici curiae on behalf of Gerawan), the majority in Glickman implicitly rejected the applicability of strict scrutiny analysis in the situation before the high court.

In Gallo, the Ninth Circuit Court of Appeals assumed, without deciding, that the complaining party—a milk and cheese producer—raised a valid ideological objection to the “Real California Cheese®” advertising campaign there at issue. (Gallo, supra, 185 F.3d 969, 976.) The court in Gallo proceeded, pursuant to Glickman, to apply the Abood/Keller test, and to uphold the program. The court reasoned: “Compelled association of the milk producers of California is justified by purposes set out in the California Marketing Act and the Marketing Order: to prevent economic waste in the marketing of commodities; to develop more efficient and equitable methods of marketing' commodities; and to maintain present markets for, as well as to develop new and larger markets for, commodities grown within the State. [Citation.] The Marketing Order itself specifically provides that the authorized promotional activities are intended to maintain the present market for, as well as create new or larger markets for, California milk and dairy products. [Citations.] The CMAB’s [California Milk Advisory Board’s] employment of a generic advertising campaign of California Milk and dairy products, including the generic advertisement of Real California Cheese®, is obviously ‘germane’ to these purposes.” (Gallo, supra, 185 F.3d at p. 976.) The court further explained in Gallo: “Because the Real California Cheese® advertising campaign is designed to increase the overall consumption of California raw milk by increasing the demand for cheese made from California milk, it is ‘germane’ to the Marketing Act’s and Marketing Order’s goals of maintaining the present market for, as well as creating new or larger markets for, California milk and dairy products. [Citations.] CMAB can therefore use Gallo’s assessments, over Gallo’s objection, to fund the generic advertisement of Real California Cheese®.” (Id., at p. 977, registered marks in original.)

Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.